# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| FROEDTERT MEMORIAL LUTHERAN HOSPITAL, INC. 9200 West Wisconsin Ave. Milwaukee, WI 53226 | ) ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:22-cv-1843 |
| XAVIER BECERRA, Secretary of Health and Human Services, 200 Independence Avenue, S.W. Washington, DC 20201 | ) ) ) ) ) ) | |
| Defendant. | ) ) ) | |

## COMPLAINT

This is an action for judicial review of the final decision of the Defendant Xavier Becerra, Secretary of the Department of Health and Human Services (the "Secretary"), concerning his determination of the Medicare direct graduate medical education ("DGME") reimbursement due to Plaintiff hospital, Froedtert Memorial Lutheran Hospital, Inc., for the direct costs it incurred hosting resident physicians in graduate medical education programs in fiscal years 2017 and 2018. The Plaintiff challenges and seeks an order setting aside the regulation that the Secretary has adopted for calculating DGME payments, 42 C.F.R. § 413.79(c)(2)(iii), because that regulation unlawfully reduced the Plaintiff's DGME payments.  The United States District Court for the District of Columbia recently ruled that 42 C.F.R. § 413.79(c)(2)(iii) violates the Medicare statute. *Milton S. Hershey Med. Ctr. v. Becerra*, No. 19-2680, 2021 WL 1966572 (D.D.C. 2021). The Plaintiff also challenges and seeks an order setting aside the Secretary's regulations at 42 C.F.R.

§§ 413.24(j) and 405.1873, which would unlawfully shield the agency from liability even if this court were to set aside the Secretary's DGME payment regulation at 42 C.F.R. § 413.79(c)(2)(iii).

## INTRODUCTION

1.      Many hospitals provide graduate medical training for resident physicians. Congress has recognized that the cost of operating these education programs is part of the overhead cost of providing care to all patients, including Medicare beneficiaries.  Therefore Congress, through the Medicare statute, has directed the Secretary to compensate hospitals on an annual per-resident basis (subject to a statutory cap) for the Medicare program's share of the direct costs incurred hosting graduate medical education programs.  *See* 42 U.S.C. § 1395ww(h).

2.      Some residents training in hospitals are known as "fellows."  These are physicians who are continuing their medical education beyond the minimum period needed for board certification.   The costs of training fellows, like the costs of training other residents, are reimbursable DGME costs.  Congress has provided that the Medicare program will reimburse hospitals for Medicare's share of training fellows, albeit at a reduced rate that reflects the fellows' greater levels of experience.  *See* 42 U.S.C. § 1395ww(h)(4)(C).

3.      The Secretary of Health and Human Services issued a regulation, 42 C.F.R. § 413.79(c)(2)(iii), that does the opposite of what Congress instructed: instead of compensating hospitals, the regulation penalizes them.  For hospitals that train fellows and whose DGME programs are operating above the statutory resident cap, the Secretary's regulation reduces the hospital's reimbursement below the statutory cap.  The regulation further reduces the hospital's reimbursement for each additional fellow that the hospital trains.  As a result, the Secretary has effectively imposed a "fellow penalty."  The fellow penalty regulation has no basis in the statute

that the Secretary purports to interpret.  It is utterly irrational; there is no conceivable reason to believe that Congress wanted the Secretary to *penalize* hospitals for training fellows, or to take money away from hospitals for the valuable patient-care services those fellows provide to Medicare beneficiaries.

4.     Plaintiff Froedtert Memorial Lutheran Hospital, Inc. trains fellows in its graduate medical education programs, and each of those programs operated above the statutory cap for the cost reporting period at issue here.  Under the Medicare statute, the Plaintiff should be reimbursed for its costs in training these fellows.  But under the Secretary's fellow penalty regulation, the Medicare program actually clawed payment back from the Plaintiff for each fellow that it trained.  Because the fellow penalty regulation is contrary to the statute, and because it is arbitrary and capricious, Plaintiff brings this action requesting that this court invalidate the fellow penalty regulation and direct the Secretary to recalculate the DGME payment for fiscal years 2017 and 2018.

5.     Plaintiff also challenges the Secretary's regulations at 42 C.F.R. §§ 413.24(j) and 405.1873.  Section 413.24(j) requires hospitals, at the time they file their annual Medicare cost reports, to identify and present to their Medicare Administrative Contractors ("MACs") unallowable claims for Medicare payment (i.e., claims for payment not permitted under the Secretary's rules) for which the hospitals ultimately intend to seek administrative and/or judicial review.  And section 405.1873 provides that if a hospital seeks administrative and/or judicial review for an unallowable claim that it did not report to the MAC at the time of filing its cost report, the Secretary will not be liable for the claim even if the hospital prevails on its claims and

a federal court sets aside the Secretary's prior payment determination.   These provisions are collectively known as the self-disallowance regulation.

6.   In its annual cost report submissions to the MAC for its fiscal years ending in 2017 and 2018, the Plaintiff did not self-disallow its claim for the DGME payments that were already unlawfully withheld because of 42 C.F.R. § 413.79(c)(2)(iii). As a result, even if this court sets aside 42 C.F.R. § 413.79(c)(2)(iii) and awards payment to the Plaintiff, the Secretary's self-disallowance regulation shields him from liability by instructing his contractors to ignore the court's judgment unless the court also invalidates 42 C.F.R. §§ 413.24(j) and 405.1873.

7.   The self-disallowance regulation is unlawful because the Secretary lacks authority to promulgate it.   Even if the Secretary does have authority to do so, the self-disallowance regulation is still unlawful because it violates the plain language of the Medicare statute governing the administrative review of provider reimbursement claims, and it is arbitrary and capricious. Requiring providers to notify their MACs of the obvious—that a Medicare regulation prohibits payment for a claim—serves no purpose other than to give the Secretary a technical reason to shield himself from liability once that regulation is invalidated.   For years, the Secretary has struggled to justify, both legally and rationally, this presentment requirement.   Indeed, this marks the Secretary's third attempt to impose a presentment requirement as a condition for obtaining relief from administrative and/or judicial review.   The first attempt was invalided by the Supreme Court, and the Secretary acquiesced in a decision by the United States District Court for the District of Columbia which invalidated his second attempt.   This third attempt should fare no better than the prior two.   Accordingly, Plaintiff asks this Court to find the self-disallowance regulation contrary to the Medicare statute and the Administrative Procedure Act.

## PARTIES

8.      Plaintiff is an academic medical center and is both a major teaching hospital and the only adult Level I Trauma Center in eastern Wisconsin.  Plaintiff participates in the Medicare program under Medicare Provider Number 52-0177 and receives DGME payments from the Medicare program for its participation in graduate medical education programs.  Plaintiff disputes the DGME payments it received from Medicare for its fiscal years ending June 30, 2017 and June 30, 2018.

9.      Defendant Xavier Becerra is the Secretary of the United States Department of Health and Human Services ("HHS").  He is sued in his official capacity.  The Centers for Medicare & Medicaid Services ("CMS") is an operating division of HHS to which the Secretary has delegated administrative authority over the Medicare program, which is established under Title XVIII of the Social Security Act.  *See* 42 U.S.C. § 301 *et seq.*  References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

## JURISDICTION AND VENUE

10.      This action arises under the Medicare statute, Title XVIII of the Social Security Act, 42 U.S.C § 1395 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559 and 701-706.

11.      Jurisdiction is proper under 42 U.S.C. §§ 1395*oo*(a)(1)(A)(ii) and 1395*oo*(f)(1).

12.      Venue is proper in this judicial district under 42 U.S.C. § 1395*oo*(f)(1).

## BACKGROUND

### I.      The Medicare Program

13.     Title XVIII of the Social Security Act, as amended, 42 U.S.C. §§ 1395-1395lll (the "Medicare statute") establishes a system of health insurance for the aged and disabled. 42 U.S.C.§ 1395c.  The Medicare program is federally funded and is administered by HHS through CMS.  42 U.S.C. § 1395kk.  Under the Medicare statute, an eligible Medicare beneficiary is entitled to have payment made by Medicare on his or her behalf for inpatient and outpatient hospital services provided by a hospital participating in the Medicare program as a provider of health care services.

14.     The Medicare program is administered by the Secretary through CMS.  42 U.S.C. § 1317.  Hospitals and other institutional "providers of services" enter into written agreements with the Secretary to furnish services to Medicare beneficiaries.  *Id*. at § 1395cc.

## II.     Medicare Payment for Direct Graduate Medical Education

15.     The Medicare program is required by statute to reimburse hospitals for direct graduate medical education costs that are attributable to the treatment of Medicare beneficiaries. 42 U.S.C. § 1395ww(h).[1]  These costs include the salaries of teaching physicians and stipends paid to resident physicians in approved programs.  *See* S. Rep. No. 404, 89th Cong., 1st Sess. 36 (1965); H.R. No. 213, 89th Cong., 1st Sess. 32 (1965).

16.     The Medicare statute prescribes a formula for computing annual DGME payments to hospitals.  42 U.S.C. § 1395ww(h).  A hospital with an approved graduate medical education program receives a "payment amount" for each cost reporting period that is calculated to be equal to the product of three factors.  42 U.S.C. § 1395ww(h)(3)(A).  The first factor is "the hospital's

---

[1] Before the implementation of the Medicare prospective payment system in 1983, the costs of resident physician services furnished to Medicare beneficiaries, which are now paid under "GME," were paid on a reasonable cost basis under Medicare Part A.  *See* Social Security Act §§ 1814(b)(1), 1861(v)(1)(A).

medicare patient load," which is the fraction of the hospital's inpatient treatment days attributable to Medicare Part A and Part C beneficiaries. 42 U.S.C. § 1395ww(h)(3)(A)(ii), (h)(3)(C), (h)(3)(D). The second factor is the "hospital's approved FTE resident amount," which is a calculation of the hospital's average cost per resident. 42 U.S.C. § 1395ww(h)(2), (h)(3)(A)(i), (h)(3)(B)(i). The third factor is "the weighted average number of full-time-equivalent residents… in the hospital's approved medical residency training programs" in the cost reporting period. 42 U.S.C. § 1395ww(h)(3)(A)(i), (h)(3)(B)(ii). This third factor is also known as the "resident FTE count." Only this third factor is at issue in this litigation in the context of the fellow penalty.

17.     As the name suggests, the resident FTE count is intended to represent the total number of residents that a hospital trains in a given cost reporting period. This number, multiplied by the hospital's average cost per resident and multiplied again by the hospital's Medicare patient load, determines the amount that the Secretary pays to the hospital to cover the Medicare program's share of the costs of the hospital's graduate medical education program.

18.     The Medicare statute does not provide for payment based simply on a raw count of the number of the hospital's full-time-equivalent residents. Instead, payment is based on the hospital's "weighted average number of full-time-equivalent residents" in its training program. 42 U.S.C. § 1395ww(h)(3)(B)(ii). The formulas for determining the "weighted" number and the "average" number are set forth in 42 U.S.C. § 1395ww(h)(4).

19.     The FTE count is "weighted" to reflect the likelihood that a hospital incurs greater costs for a resident at the beginning his or her residency than it does for a resident who is nearing the completion of that education. The statute thus provides that, "in calculating the number of full-time-equivalent residents in an approved residency program … for a resident who is in the

resident's initial residency period … the weighting factor is 1.00." 42 U.S.C. § 1395ww(h)(4)(C)(ii).  (The initial residency period is the minimum number of years of formal training needed to meet the requirements for initial board eligibility in the resident's particular specialty.  42 U.S.C. § 1395ww(h)(5)(F), (G).)

20.     Residents who continue in a hospital's graduate medical education program beyond their initial residency period are commonly referred to as "fellows."  The statute recognizes that a hospital will continue to incur costs in training fellows, albeit at a lower rate than the hospital incurs for more junior residents, and that the Medicare program should pay its fair share of these costs.  The statute thus assigns a reduced (but still positive) weighting factor for fellows: "in calculating the number of full-time-equivalent residents in an approved residency program … for a resident who is not in the resident's initial residency period … the weighting factor is .50."  42 U.S.C. § 1395ww(h)(4)(C)(iv).  Thus, the actual count of a hospital's full-time equivalent residents who are in their initial residency period (IRP), plus one-half of the actual count of the hospital's full-time equivalent residents who are fellows, equals the "weighted … number of full-time-equivalent residents."  By way of example, a hospital that trained 10 IRP residents and 10 fellows would have a weighted FTE count of 15.

21.     The "average" number of full-time equivalent residents is determined by calculating the average of the hospital's actual count of full-time-equivalent residents for the current cost reporting period and each of the two preceding periods:

> [T]he total number of full-time equivalent residents for determining a hospital's graduate medical education payment shall equal the average of the actual full-time equivalent resident counts for the cost reporting period and the preceding two cost reporting periods.

42 U.S.C. §1395ww(h)(4)(G)(i).  That average, after the application of the weighting factors described above, determines the "weighted average number of full-time-equivalent residents" for which the Medicare program makes payment.  42 U.S.C. § 1395ww(h)(3)(B)(ii).  By way of example, a hospital that trained 10 IRP residents and 10 fellows in its second-to-last cost reporting period, 12 IRP residents and 12 fellows in its last cost reporting period, and 14 IRP residents and 14 fellows in its current cost reporting period would have a weighted average FTE count of 18.

22.     That "weighted average number" is subject to a statutory cap.  Since 1997, the Medicare statute has placed a limit on the number of resident FTEs in the fields of allopathic and osteopathic medicine that a hospital can count in a given year.  This limit, known as the "FTE cap," is set by the number of unweighted FTEs that the hospital reported on its most recent cost reporting period ending on or before December 31, 1996.  In this regard, the statute states:

> [F]or purposes of a cost reporting period beginning on or after October 1, 1997 … the total number of full-time equivalent residents before application of weighting factors (as determined under this paragraph) with respect to a hospital's approved medical residency training program in the fields of allopathic medicine and osteopathic medicine may not exceed the number (or, 130 percent of such number in the case of a hospital located in a rural area) of such full-time equivalent residents for the hospital's most recent cost reporting period ending on or before December 31, 1996.

42 U.S.C. § 1395ww(h)(4)(F)(i).  This paragraph, read together with the provisions defining the calculation of the "weighted average number" of full-time-equivalent residents, sets forth a rule that the Medicare program will reimburse hospitals for the costs of training all of their residents— IRP residents and fellows alike—up to the statutory cap.

### III.     The Secretary's Regulation Penalizes Hospitals for Training Fellows

23.     The Secretary has issued a regulation that flips this statutory directive on its head. Rather than providing for reimbursement to hospitals for their costs of training both IRP residents and fellows, and for the valuable services those residents and fellows provide to Medicare beneficiaries, the Secretary's rule actually *reduces* the total amount of reimbursement to hospitals for each fellow that the hospital trains.

24.     The statute directs the Secretary to "establish rules … for the computation of the number of full-time-equivalent residents in an approved medical residency training program." 42 U.S.C. § 1395ww(h)(4). In a purported exercise of this authority, the Secretary has adopted a regulation that addresses situations where the actual number of residents trained by the hospital in the cost reporting year exceeds the hospital's FTE cap.

> If the hospital's number of FTE residents…exceeds [the FTE cap or limit], the hospital's weighted FTE count (before application of the limit)…will be reduced in the same proportion that the number of FTE residents for that cost reporting period exceeds the [FTE cap or limit].

42 C.F.R. § 413.79(c)(2)(iii).

25.     As mentioned above, the statute provides that a hospital's unweighted FTE count is adjusted by weighting factors depending on the status of the residents (in the first example above, 20 FTEs are reduced to 15). 42 U.S.C § 1395ww(h)(4)(C). The Secretary's regulation unlawfully further reduces a hospital's weighted FTE count in cases in which the hospital trains residents (whether IRPs or fellows) above the FTE cap. In cases where a hospital has trained residents in excess of the statutory FTE cap, the regulation replaces the statutory formula for determining the "weighted … number" of FTE residents with a new formula that multiplies the statutory weighted

FTE count by a new fraction consisting of the hospital's FTE cap (numerator) and the number of unweighted FTEs the hospital reported in that cost reporting year (denominator).

26.     The Secretary's formula for double weighting the FTE count in 42 C.F.R. § 413.79(c)(2)(iii) has no basis in the text of the statute that it purports to interpret.  Moreover, the regulation produces irrational results.  If a hospital is training residents in excess of its cap, and some of its residents are fellows, under the regulation each fellow that the hospital reports in excess of its cap will actually *reduce* its DGME reimbursement.  That is, the Secretary inexplicably imposes a "fellow penalty."

27.     The following hypothetical demonstrates how the Secretary's regulation imposes the fellow penalty.  Hospital A has an FTE cap of 100.  In Year 1, Hospital A trains 100 IRP residents and zero fellow residents.  Hospital A's unweighted FTE count is 100, and its weighted FTE count is also 100.  Since Hospital A is not operating above its cap, it can claim all 100 of its weighted FTEs for reimbursement in the present year.

28.     In Year 2, Hospital A trains 200 IRP residents and zero fellow residents.  Hospital A's unweighted FTE count is 200.  Because Hospital A's unweighted FTEs are in excess of its cap, it cannot claim its 200 weighted FTEs for reimbursement in the present year.  The number of FTEs that Hospital A can claim in Year 2 is limited to its allowable FTE count, as calculated in accordance with in 42 C.F.R. § 413.79(c)(2)(iii).  On these facts, the allowable FTEs formula produces a result of 100, which is equal to Hospital A's FTE cap.  Hospital A is not subject to the fellow penalty in Year 2 because it is not training any fellows.

29.     In Year 3, Hospital A trains 200 IRPs and 100 fellows.  Hospital A's unweighted FTE count is 300, and its weighted FTE count is 250.  As was the case in Year 2, Hospital A is

operating above its cap, which means the number of FTEs it can claim in Year 3 is again limited to its allowable FTEs.  Hospital A's allowable FTEs in Year 3 under the Secretary's regulation is equal to 250 weighted FTEs x (100 FTE cap / 300 unweighted FTEs), or 83.33.  Notably, Hospital A's present-year FTEs are 16.67 lower in Year 3 than they were in Years 1 and 2, when Hospital A trained zero fellows.

30.    Hospital A's FTE count will continue to decrease as it takes on more fellows.  In Year 4, Hospital A trains 200 IRP residents and 200 fellow residents.  Hospital A's unweighted FTE count is now 400 and its weighted FTE count is 300.  Under the Secretary's regulation, Hospital A's allowable FTEs in Year 4 is equal to 300 weighted FTEs x (100 FTE cap / 400 unweighted FTEs), or 75.  Hospital A's present-year FTEs are lower in Year 4 than in Years 1 and 2 when Hospital A no fellows, and lower than in Year 3 when Hospital A trained only half as many fellows.  The effect of the regulation on Hospital A's Medicare reimbursement for Years 1, 2, 3, and 4 is detailed in the following table:

|  | Cap | IRPs | Fellows | Unweighted FTEs | Weighted FTEs | Allowable FTEs | Reimbursable FTEs |
|---|---|---|---|---|---|---|---|
| Year 1 | 100 | 100 | 0 | 100 | 100 | NA | 100 |
| Year 2 | 100 | 200 | 0 | 200 | 200 | 200 x (100/200) =100 | |
| Year 3 | 100 | 200 | 100 | 300 | 250 | 250 x (100/300) = 83.33 | |
| Year 4 | 100 | 200 | 200 | 400 | 300 | 300 x (100/400) = 75 | |

31.    The United States District Court for the District of Columbia has recently ruled that 42 C.F.R. § 413.79(c)(2)(iii) is unlawful.  *Milton S. Hershey Med. Ctr. v. Becerra*, No. 19-2680, 2021 WL 1966572 (D.D.C. 2021).  The hospitals in *Hershey* challenged the Secretary's regulation at 42 C.F.R. § 413.79(c)(2)(iii) just as the Plaintiff does here.  The *Hershey* court ruled that the regulation violates the statue because it applies a weighting factor to fellows that is lower than the

factor prescribed by the statute.  "[W]hen the hospital exceeds the cap, and employs fellows, the post-regulation weighted FTE no longer reflects [the] weights" set forth in the statute (i.e., 1.0 for residents in their initial residency period and 0.5 for fellows).  *Id*. at *10.  While acknowledging that the statute gives the Secretary discretion to adopt DGME payment rules, the court observed that the statute expressly requires those rules to be "consistent with" the DGME provisions of the statute, including the weighting factors.  The *Hershey* court ultimately remanded the case back to the Secretary with instructions to recalculate the plaintiffs' DGME payments.  The Secretary initially appealed the *Hershey* decision to the United States Court of Appeals for the District of Columbia, but subsequently withdrew his appeal.  The Secretary has since issued a proposed rule proposing a nationwide acquiescence to the *Hershey* decision.  87 Fed. Reg. 28,108, 28,411-12 (May 10, 2022).  The Secretary has yet to finalize that proposal.

### IV.    Medicare Cost Report Appeals

32.    The Secretary contracts with Medicare Administrative Contractors ("MACs") to administer payment to hospitals participating in the Medicare program.

33.    Hospitals receive interim payments from MACs throughout the year.  Interim payments are reconciled at the end of the year based on annual cost reports submitted by the hospitals that identify the costs incurred furnishing services to Medicare beneficiaries.  42 C.F.R. § 413.20.  A hospital's MAC will audit the cost report and issue a notice of program reimbursement ("NPR").  *Id*. § 405.1803.  The NPR itemizes adjustments to the cost report and represents the final determination of the MAC as to the amount of Medicare reimbursement owed to the hospital for the period.

34.     Hospitals dissatisfied with the final determinations of their MACs have recourse to the Provider Reimbursement Review Board ("Board").  42 U.S.C. § 1395*oo*.  The statute sets forth three—and only three—requirements a hospital must meet for the Board to grant the hospital a hearing: (1) it must be "dissatisfied with a final determination of the…fiscal intermediary," (2) the amount in controversy must be $10,000 or more ($50,000 in the aggregate for group appeals), and (3) the hospital must file its request for a hearing within 180 days after the receiving the NPR from the MAC.  42 U.S.C. § 1395*oo*(a)-(b).

35.     When the Board has jurisdiction to hear an appeal, but the appeal involves a statute, regulation, or policy that the Board is without authority to overturn, the Board may, through its own motion or upon request of the provider, grant expedited judicial review ("EJR") of the appeal. 42 U.S.C. § 1395*oo*(f)(1).  If EJR is granted, the provider can seek judicial review in federal court without first having a hearing before the Board.  *Id.*  The provider must file its complaint no later than 60 days after receiving notice of the Board's decision to grant EJR.  *Id.*

## V.     The Self-Disallowance Regulation

36.     The Secretary has over the years attempted to retrofit a fourth requirement, described by the Supreme Court as a "presentment" requirement, into the statutory conditions for Board relief.  The Health Care Finance Administration ("HCFA"), the precursor to CMS, initially required providers to present all claims to their MACs in the first instance on their cost reports, even if the MAC had no authority to make the requested payment.  At that time, HCFA reasoned that presenting an unallowable claim to the MAC was necessary to show the provider was "dissatisfied" with the amount of program reimbursement as that term is used in section 1395*oo*(a)(1)(A)(i).  The Supreme Court rejected this interpretation in *Bethesda Hospital*

*Association v. Bowen*, finding that presenting nonallowable claims to the MAC would be an exercise in futility, and that "[n]o statute or regulation expressly mandates that a challenge to the validity of a regulation be submitted first to the [MAC]." 485 U.S. 399, 404 (1988).

37.     The Secretary wrongly interpreted the *Bethesda* decision as an invitation to adopt a presentment requirement by regulation. In 2008, the Secretary adopted a regulation requiring hospitals to present unallowable claims to MACs as a precondition to the Board granting the provider a right to a Board hearing. 42 C.F.R. § 405.1835(a)(1)(ii) (repealed). If a provider did not follow the self-disallowance regulation, the Board was instructed to dismiss the provider's appeal. The D.C. District Court invalidated the Secretary's regulation in *Banner Heart Hosp. v. Burwell*, 201 F. Supp. 3d 131 (D.D.C. 2016). The *Banner* court ruled that *Bethesda* was based on the Court's reading of the "plain meaning of the statute" and its "language and design…as a whole." The *Bethesda* Court's decision did not turn on the fact that the Secretary had not adopted a presentment requirement by regulation because such a regulation would be contrary to the statute. *Id*. at 140. The Secretary claimed to acquiesce in the *Banner* decision and does not require providers to go through the futile process of self-disallowing unallowable claims for cost reporting periods that began before January 1, 2016.

38.     Cost reporting periods beginning on or after January 1, 2016 are controlled by the Secretary's third iteration of the self-disallowance (or presentment) requirement. In 2015 (while the *Banner* decision was pending) the Secretary adopted yet another regulation requiring hospitals to present futile claims to the MACs to gain access to Board relief. The new regulation, which applies to cost reporting periods beginning on or after January 1, 2016, states in relevant part as follows:

> In order for a provider to receive or potentially qualify for reimbursement for a specific item for its cost reporting period, the provider's cost report…must include an appropriate claim for the specific item, by…
>
> …
>
> (ii) Self-disallowing the specific item in the provider's cost report, if the provider seeks payment that it believes may not be allowable or may not comport with Medicare policy…

42 C.F.R. § 413.24(j) (emphasis added).

39.     Unlike the regulation struck down in *Banner*, the Board is not instructed to dismiss the provider's appeal if it does not comply with the current self-disallowance regulation.  Under the Secretary's reasoning, *Bethesda* requires the Board to grant the provider a hearing.  But in an attempt to evade the holding of *Bethesda*, the Secretary's new regulation establishes the presentment requirement as a "[s]ubstantive reimbursement requirement for an appropriate cost report claim," i.e., a condition for receiving payment from the Medicare program.  Thus, although the Board must grant the provider a hearing on the merits, the Secretary's new regulations expressly prohibit the Board from permitting reimbursement for items that were not self-disallowed in the cost report.  Section 413.24(j)(5) of the regulation says that a "reviewing entity" such as the Board "may only permit reimbursement for the specific item under appeal solely to the extent authorized by § 405.1873(f)." And section 405.1873(f)(1)(ii) says that an appeal item "is not reimbursable" if the Board makes the factual finding that the hospital "[d]id not include an appropriate cost report claim for the specific item under appeal," i.e., did not self-disallow the item in the cost report.  In order to pay lip service to *Bethesda*, the regulation allows the Board to retain jurisdiction to hear the appeals of providers that have not complied with the self-disallowance regulation, but the regulation strips the Board of its power to "affirm, modify or reverse a final

determination of the" MAC as Congress granted in 42 U.S.C. § 1395*oo*(d).  This third attempt to impose a presentment requirement is no more lawful than the prior two.

40.     In addition to being futile, the Secretary uses the presentment requirement to shield himself from liability for past payment errors that remain hidden from providers for years.  Once the error is eventually discovered and successfully challenged in court, the Secretary can cite the presentment requirement to deny the same relief to providers who did not "self-disallow" the lost payment on their cost reports solely because they were never aware it existed.

### PROCEDURAL HISTORY

41.     Plaintiff hosted residents in graduate medical education programs during its cost reporting periods ending June 30, 2017 and June 30, 2018.  Because the Plaintiff was training residents in excess of its FTE cap during those periods, and some of its residents were fellows, Plaintiff was subject to the fellow penalty and its DGME payments were reduced as a result of the Secretary's regulatory formula at 42 C.F.R. § 413.79(c)(2)(iii).  Plaintiff did not claim the amount of these reduced DGME payments (because to do so was prohibited by regulation) in its cost reports for these periods nor did Plaintiff identify the reduced amount as a self-disallowed item unlawfully withheld from its DGME payments.

42.     Pursuant to the procedures set forth at 42 U.S.C. § 1395*oo*, Plaintiff filed appeals with the Board for its cost reporting periods ending June 30, 2017 and June 30, 2018.  The Plaintiff's appeals challenged the Secretary's treatment of its claims for DGME reimbursement as described in the preceding paragraphs.

43.     Plaintiff's appeals satisfied all statutory requirements for Board review.  Plaintiff (i) was dissatisfied with a final determination of the MAC as to its amount of Medicare

reibursemet, (ii) filed a request for hearing before the Board within 180 days after receiving the final determination, and (iii) identified the total amount in controversy was over $10,000.  42 U.S.C. § 1395*oo*(a)-(b).

44.      On April 28, 2022, Plaintiff submitted a request to the Board for EJR in accordance with 42 U.S.C. § 1395*oo*(f)(1).   The Plaintiff specifically requested EJR with respect to its challenge of the Secretary's regulatory formula at 42 C.F.R. § 413.79(c)(2)(iii).   Additionally, because the Provider did not self-disallow the DGME payments that were unlawfully withheld, the Plaintiff also requested EJR with respect to the Secretary's self-disallowance regulation at 42 C.F.R. §§ 413.24(j)(2) and 405.1873.

45.      On May 25, 2022, the Board granted the Plaintiff's request for EJR.  The Board specifically found that "[i]t has jurisdiction over both the DGME Penalty Issue and the challenge to the validity of 42 C.F.R. §§ 413.24(j) [sic] for the subject years…" but "is without the authority to decide the legal questions of whether 42 C.F.R. § 413.79(c)(2)(iii) is valid and whether the regulation at 42 C.F.R. §§ 413.24(j) and 405.1873 are valid."  Exhibit A.

46.      Plaintiff now files this civil action within 60 days of the date on which it received notification of the Board's EJR decision.

47.      Because the Secretary exceeded his statutory authority, and acted arbitrarily and capriciously, in adopting both the fellow penalty regulation at 42 C.F.R. § 413.79(c)(2)(iii) and the self-disallowance regulation at 42 C.F.R. §§ 413.24(j) and 405.1873, Plaintiff brings this suit seeking the invalidation of both regulations, and the recalculation of the proper DGME reimbursement owed to the hospital.

## COUNT I

### <u>Violation of the Medicare Statute: DGME Payments</u>

48.    Plaintiff incorporates paragraphs 1 through 47 as if fully set forth herein.

49.    The APA, as incorporated into the Medicare statute, permits judicial review of agency actions, findings, and conclusions that are "not in accordance with law" or are "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. §§ 706(2)(A), 706(2)(C), 42  U.S.C § 1395oo(f).

50.    The Secretary's fellow penalty regulation is unlawful because it violates the plain meaning of the statute governing GME payments, 42 U.S.C. § 1395ww(h).  That statute sets forth in precise terms the calculation of the "weighted average number of full-time-equivalent residents" and the statutory cap that applies to this calculation.   The Secretary's regulation unlawfully substitutes the statute with a new formula that imposes a different, lower cap that has no basis in the statutory text.  The Secretary's regulation also unlawfully applies lower weighting factors than those required by the statute.  *See Milton S. Hershey Med. Ctr. v. Becerra*, No. 19-2680, 2021 WL 1966572 (D.D.C. 2021).

51.    The Secretary's fellow penalty regulation is unlawful because it unreasonably interprets Section 1395ww(h).  Under the fellow penalty regulation, a hospital that is subject to the FTE cap will lose reimbursement for each additional fellow that it trains.  Congress plainly intended, in enacting the GME reimbursement statute, that the Medicare program would pay its fair share for the training both of IRP residents and of fellows, and for the valuable patient-care services that both residents and fellows provide.  Yet the Secretary's regulation, unreasonably, converts the statute into a provision that penalizes hospitals for training fellows, and that takes

reimbursement away from hospitals in exchange for the valuable patient-care services those fellows provide to Medicare beneficiaries.

52.     The Secretary's fellow penalty regulation further violates the Medicare statute's prohibition on cross-subsidization of Medicare beneficiaries.  The Medicare statute guarantees that the costs of delivering covered services to Medicare beneficiaries "will not be borne by individuals not so covered."  42 U.S.C. § 1395x(v)(1)(A).  Because the fellow penalty regulation not only denies reimbursement to hospitals for their costs in training fellows, but actually takes payment away from hospitals for each fellow that they train, the regulation forces the cost of patient care provided by fellows to Medicare beneficiaries to be borne by third parties.

**COUNT II**

**Violation of the Administrative Procedure Act: Arbitrary and Capricious Agency Action – DGME Payments**

53.     Plaintiff incorporates paragraphs 1 through 52 as if fully set forth herein.

54.     The APA, as incorporated into the Medicare statute, permits judicial review of agency actions, findings, and conclusions that are "arbitrary, capricious," or "an abuse of discretion."  5 U.S.C. § 706(2)(A), 42 U.S.C. § 1395oo(f).

55.     The Secretary's fellow penalty regulation is arbitrary and capricious because it imposes a formula for the calculation of GME reimbursement that has no basis in the statutory text, and because his formula irrationally penalizes hospitals for training fellows.  Congress could not have intended to penalize hospitals simply for training more residents than they may claim for DGME reimbursement.  There is no public policy purpose that can explain why Congress would want to impose such a penalty.  Taking reimbursement away from hospitals for each fellow trained

above its cap is especially irrational, given that the Secretary has acknowledged that residents and fellows provide valuable patient-care services to Medicare beneficiaries.  *See*, e.g., 54 Fed. Reg. at 40,302.  There is, therefore, no possible rationale for a rule where the more patient-care services the hospital provides through its fellows, the more money is taken away from the hospital.

56.     The irrationality of the Secretary's "fellow penalty" policy is underscored by the fact that the Secretary would reimburse a hospital for the same services performed by a fellow under different circumstances, such as if the fellow was in an unapproved program or "moonlighting."   *See* 42 C.F.R. § 415.202 (providing payments based on a percentage of reasonable costs for "services of a resident who is not in any approved GME program"); 42 C.F.R. § 415.208(b)(3) (providing reimbursement for the services of a moonlighting resident or fellow under the physician fee-schedule since "the services of the moonlighting physician are considered to have been furnished by the individual in his or her capacity as a physician, rather than in the capacity of a resident").

57.     The Secretary's policy of penalizing hospitals for training residents while operating above their FTE caps is arbitrary and capricious in several additional respects.  First, the Secretary has failed to articulate a satisfactory explanation for his action.  In the rulemaking adopting the fellow penalty regulation, the Secretary did not provide any explanation for why his chosen formula was necessary to implement the FTE cap.  62 Fed. Reg. 45,966, 46,005 (Aug. 29, 1997).  Nor did the Secretary explain why it is appropriate or consistent with the statute to penalize hospitals for training fellows while operating above their FTE caps.  Id.

58.     Second, the Secretary's failure to explain his reasoning indicates that he entirely failed to consider an important aspect of the problem, namely, the extent to which his chosen

formula for calculating allowable FTEs would penalize hospitals that train fellows and operate over their FTE caps.

59.     Third, the Secretary failed to consider significant and viable and obvious alternatives that were available to him.  One obvious and viable alternative would be to follow the language of the statute and to pay hospitals for the "weighted average number" of their full-time-equivalent residents, up to the statutory cap.  This formula is dictated by the statute, or at the very least, is not foreclosed by the statute.  This formula also serves Congress's obvious intent to reimburse, not to penalize, hospitals for training fellows who provide care to Medicare beneficiaries, subject to a cap.  Yet the Secretary failed to consider this obvious alternative when he adopted the fellow penalty regulation.

60.     Fourth, in adopting the fellow penalty regulation, the Secretary relied on factors that Congress did not intend him to consider in calculating hospital DGME payments.   In particular, Congress has not authorized the Secretary, in determining a hospital's DGME payment, to consider whether and to what extent a hospital is training fellows while operating in excess of its FTE cap.  Yet the fellow penalty regulation does just that.

## COUNT III

### Violation of the Medicare Statute: Board Authority

61.     Plaintiff incorporates paragraphs 1 through 60 as if fully set forth herein.

62.     The APA instructs that a reviewing court "shall…hold unlawful and set aside agency action…found to be…not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."   5 U.S.C. § 706(2)(A)-(C), 42 U.S.C. § 1395oo(f).

63.     The Secretary's self-disallowance regulation is unlawful because Congress did not grant him authority to promulgate the rule in the first instance.  "A precondition to deference under *Chevron* is a congressional delegation of administrative authority."  *New York Stock Exch. LLC v. SEC*, 962 F.3d 541, 552 (D.C. Cir. 2020) (cleaned up).  Without Congress's grant of authority, an agency "literally has no power to act."  *Id.* at 553 (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).  As the Supreme Court observed in *Bethesda Hospital Ass'n v. Bowen*, no provision exists in which Congress granted the Secretary the authority to promulgate a self-disallowance requirement.  485 U.S. 399, 404 (1988).

64.     The Secretary's self-disallowance regulation is also unlawful because it conflicts with the Medicare statute. When Congress enacted § 1395*oo*(d), it expressly granted the Board "the power to affirm, modify, or reverse a final determination of the [contractor] with respect to a cost report…."  42 U.S.C. § 1395*oo*(d).  This section empowers the Board to "modify, or reverse a final determination of the [contractor] with respect to a cost report" and to compel the contractor to pay amounts owed to the provider as reflected in the provider's cost report.  42 C.F.R. §§ 413.20(b), 405.1803(a).

65.     When the Supreme Court interpreted "the plain language" of § 1395*oo*(d), the Court observed that "[t]he only limitation prescribed by Congress [in § 1395*oo*(d)] is that the matter must have been 'covered by such cost report,' that is, a cost or expense that was incurred within the period for which the cost report was filed, even if such cost or expense was not expressly claimed."  *Bethesda Hospital Ass'n v. Bowen*, 485 U.S. 399, 406 (1988).

66.     Section 413.24(f)(5) provides that a "reviewing entity," such as the Board, "may only permit reimbursement for the specific item under appeal solely to the extent authorized by §

405.1873(f)."  Section 405.1873(f)(1)(ii), in turn, bars the Board from reimbursing the provider if the provider "[d]id not include an appropriate cost report claim for the specific item under appeal, the specific item is not reimbursable" even "regardless of whether the Board further determines in such final hearing decision that the other substantive reimbursement requirements for the specific item are … satisfied."  These two regulatory provisions expressly preclude the Board from using the statutory powers granted by Congress and unlawfully prohibit the Board's statutory power to compel the Secretary to make payment by imposing an extra-statutory limitation—namely, a prohibition on the Board's power to compel payment of costs or claims not presented in a cost report.

67.     Accordingly, the Secretary's regulations at 42 C.F.R. §§ 413.24(j) and 405.1873 are contrary to the Medicare statute because the regulations impermissibly constrain the authority granted by 42 U.S.C. § 1395*oo*(a)(1)(A)(i) to the Board to decide a provider's dissatisfaction with "the amount of total program reimbursement due the provider." 42 U.S.C. § 1395*oo*(a)(1)(A)(i).

## COUNT IV

## Violation of the Administrative Procedure Act: Arbitrary and Capricious Agency Action – Board Authority

68.     Plaintiff incorporates paragraphs 1 through 67 as if fully set forth herein.

69.     The APA instructs that a reviewing court "shall…hold unlawful and set aside agency action…found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A)–(C), 42 U.S.C. § 139500(f).

70.     Agency action is arbitrary and capricious when the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

71.     Agency action fails the arbitrary and capricious test when it fails to demonstrate "reasoned decision making." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983); *see also Nat'l Telephone Co–op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) ("The APA's arbitrary-and-capricious standard requires that agency rules be reasonable and reasonably explained.").

72.     The Secretary's self-disallowance regulation fails to show reasoned decision-making because the regulation contradicts the plain language of the statute and courts have now twice-informed the Secretary that a protest requirement is unlawful.  Congress granted to the Board the authority to decide issues brought to it by providers related to "the amount of the total program reimbursement due the provider." 42 U.S.C. § 1395*oo*(a)(1)(A)(i).  In direct contrast, the Secretary's regulations take that power away from the Board and prevent the Board from deciding the amount of total program reimbursement due to the provider.  In addition, the rationales the Secretary provided for the imposition of the self-disallowance regulation do not withstand scrutiny and are belied by how the requirement is applied in practice which is solely as a technical filing requirement to be used by the Secretary and his agents to shield himself from liability and deny Medicare reimbursement that is otherwise required by statute and binding regulations.

73.     The self-disallowance regulation is also arbitrary and capricious because, in promulgating this regulation, the Secretary did not explain how he reconciled his policy with the Board's statutory authority to decide Medicare reimbursement disputes.   Because the regulations at 42 C.F.R. §§ 413.24(j) and 405.1873 are arbitrary and capricious and an abuse of discretion, they are unlawful and invalid.

### RELIEF REQUESTED

74.     Plaintiff Froedtert Memorial Lutheran Hospital, Inc. requests an Order:

(a)  Declaring invalid and enjoining the Secretary from applying the fellow penalty regulation, 42 C.F.R. § 413.79(c)(2)(iii), for purposes of calculating its DGME reimbursement for the cost reporting periods at issue in this litigation;

(b)  Directing the Secretary to calculate the Plaintiff's DGME reimbursement in a manner consistent with that Order, and to make prompt payment of any additional amounts due the Plaintiff plus interest calculated in accordance with 42 U.S.C. § 1395$oo$(f)(2);

(c)  Declaring invalid and enjoining the Secretary from applying the self-disallowance requirement at 42 C.F.R. §§ 413.24(j) and 405.1873;

(d)  Requiring the Secretary to pay legal fees and cost of suit incurred by the Plaintiff; and

(e)  Providing such other relief as the Court may consider appropriate.

Respectfully submitted,

/s/ Mark D. Polston
Mark D. Polston, D.C. Bar No. 431233
Daniel J. Hettich, D.C. Bar No. 975262
Alek Pivec, D.C. Bar No. 1046247 (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C.  20006
(202) 626-5540 (phone)
(202) 626-3737 (fax)
MPolston@kslaw.com

*Attorneys for Plaintiffs*

Date:  June 28, 2022